**Frederick SPENCER, Appellant,**

v.

**STATE of Missouri, et al., Respondent.**

**No. WD 72100.**

Missouri Court of Appeals,
Western District.

Dec. 28, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2011.

Application for Transfer Denied
April 26, 2011.

560

Frederick Spencer, Bowling Green, MO, pro se.

Emily A. Dodge, Esq., Jefferson City, MO and John L. McMullin, III, Esq., St. Louis, MO, for respondent.

Before: MARK D. PFEIFFER, P.J., and VICTOR C. HOWARD and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Dr. Frederick Spencer is currently incarcerated based on his convictions for forcible rape and forcible sodomy. He appeals the Cole County Circuit Court's judgment dismissing his petition for declaratory relief with prejudice. Although he makes multiple arguments, Spencer's primary claim is that the Missouri Sex Offender Program ("MoSOP") violates his Fifth Amendment privilege against self incrimination, by requiring that he admit to commission of the offenses of which he was convicted as a condition of successful completion of the program. Spencer alleges that he was terminated from the program because of his refusal to admit his guilt, and that he was denied eligibility for parole, conditional release, and good-time credits against his sentence as a result of his failure to complete the program.

For the reasons which follow, we affirm the dismissal of Spencer's petition.

### Factual Background

After a jury trial, Spencer, a psychologist, was convicted of three counts of forcible rape and three counts of forcible sodomy. The sexual assaults allegedly occurred in 1994 and 1995 and involved

two of Spencer's patients. The Circuit Court for the City of St. Louis sentenced Spencer to a total of fifteen years' imprisonment. The Eastern District affirmed Spencer's convictions on direct appeal. *State v. Spencer,* 50 S.W.3d 869 (Mo.App. E.D.2001). The Eastern District later affirmed the denial of Spencer's post-conviction relief motion following an evidentiary hearing, *Spencer v. State,* 156 S.W.3d 365 (Mo.App. E.D.2004), and the denial of his motion to reopen the post-conviction relief proceedings based on alleged abandonment by post-conviction counsel. *Spencer v. State,* 255 S.W.3d 527 (Mo.App. E.D. 2008).

Spencer was afforded two opportunities to complete the MoSOP. On each occasion, he was terminated from the program because he refused to acknowledge or admit his guilt for the offenses for which he was convicted.

Spencer filed his petition seeking declaratory and injunctive relief on April 3, 2009. He alleges that he has unconstitutionally been denied parole, and eligibility for conditional release and good-time credits, based on his failure to complete the MoSOP, and that his failure to complete the program is due to his unwillingness to admit guilt for the offenses for which he stands convicted.[1] Spencer alleges that, due to his failure to complete the program, he will be required to serve 100% of his sentence in prison. His petition argues that the requirement that he complete MoSOP to be eligible for early release violates his rights under various provisions of both the federal and state constitutions.[2] Spencer seeks a declaration that the Mo-

SOP as currently implemented is unconstitutional, an injunction against further extensions of his period of incarceration, and immediate release based on the alleged accrual of his conditional release and time-credit release dates.

The State filed a motion to dismiss the petition. The circuit court granted the State's motion and dismissed Spencer's petition with prejudice, finding that he had failed to state a claim on which relief could be granted. Following entry of the trial court's judgment, Spencer filed both a notice of appeal and a motion to vacate the judgment, which the circuit court denied. Following entry of the judgment Spencer also filed a motion for leave to file a first amended petition, which was likewise denied.

This appeal follows.[3]

## Standard of Review

■■■■ "In reviewing the court's dismissal of appellant's declaratory judgment action, we deem all facts pleaded to be true, liberally construe the petition's averments, and draw all reasonable and fair inferences therefrom." *Sandy v. Schriro,* 39 S.W.3d 853, 855 (Mo.App. W.D.2001) (citation omitted). "We review the allegations set forth in the petition in order to determine whether principles of substantive law are invoked, which, if proved, would entitle petitioner to declaratory relief." *Id.* "If so, then the petition is sufficient and cannot be dismissed for failure to state a claim." *Id.* "In other words, if the petition contains facts, not mere conclusions, supporting its allegations, and those

---

1. On appeal Spencer has abandoned any claim concerning his parole eligibility.

2. Spencer's appeal is limited to federal constitutional claims.

3. Spencer initially sought to appeal to the Missouri Supreme Court, based on his contention that this appeal involves the validity of a Missouri statute or constitutional provision. On February 8, 2010, the Missouri Supreme Court entered an order in No. SC90589 transferring the appeal here.

facts demonstrate a justiciable controversy, then we will reverse the court's dismissal and remand the cause to the court for a determination of the parties' rights." *Id.*

## Analysis

### I.

Spencer's principal argument is that the State has violated his Fifth Amendment privilege against self incrimination because it conditions eligibility for conditional release and good-time credits on an inmate's successful completion of the MoSOP, which in turn requires an admission of guilt concerning the inmate's sexual offenses. We disagree.[4]

The Fifth Amendment to the United States Constitution, applicable to the States by virtue of the Fourteenth Amendment, provides in relevant part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."

Section 589.040[5] requires that the DOC develop a treatment and rehabilitation program for sexual assault offenders, and that all sexual assault offenders successfully complete the program. It states:

1. The director of the department of corrections shall develop a program of treatment, education and rehabilitation for all imprisoned offenders who are serving sentences for sexual assault offenses. When developing such programs, the ultimate goal shall be the prevention of future sexual assaults by the participants in such programs, and the director shall utilize those concepts, services, programs, projects, facilities and other resources designed to achieve this goal.

2. All persons imprisoned by the department of corrections for sexual assault offenses shall be required to successfully complete the programs developed pursuant to subsection 1 of this section.

§ 589.040.

DOC developed the MoSOP to comply with § 589.040. Its guidelines provide that "[s]uccessful completion of Phase I is dependent upon the offender's acknowledgement and admittance of their sexual offense and a willingness to work toward personal change." DOC Policy D5–4.1. Spencer alleges that the Board of Probation and Parole uniformly requires sexual offenders to complete the MoSOP before being considered for conditional release under § 558.011, or being awarded good-time credit under § 558.041.

Our analysis of Spencer's Fifth Amendment claim begins with the United States Supreme Court's decision in *McKune v. Lile,* 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002). Because *McKune* is central to our resolution of Spencer's principal claim, we describe the Court's opinions in that case in some detail.

In *McKune,* a Kansas inmate convicted of rape, aggravated sodomy, and aggravated kidnapping sought an injunction to pre-

---

**4.** It may be questionable whether Spencer's privilege against self-incrimination applies here, since Spencer has been convicted of the offenses in question, and those convictions were affirmed on direct appeal over nine years ago. *See State v. McKeller,* 256 S.W.3d 125, 128 (Mo.App. S.D.2008). Spencer's petition alleges, however, that he has denied his responsibility for those offenses under oath in post-conviction proceedings and elsewhere, and that he is therefore subject to potential

prosecution for perjury. Given these allegations, and because Spencer's claims were dismissed on the pleadings, we do not believe the judgment can be affirmed on the basis that Spencer presently has no Fifth Amendment rights which the MoSOP could infringe.

**5.** Statutory references are to the RSMo 2000, as updated through the 2009 Cumulative Supplement.

vent prison officials from withdrawing certain prison privileges and transferring him to a different ·housing unit based on his failure to participate in Kansas' Sexual Abuse Treatment Program ("SATP"). As here, the inmate (respondent Lile) "refused to participate in the SATP on the ground that the required disclosures of his criminal history would violate his Fifth Amendment privilege against self-incrimination." *Id.* at 31, 122 S.Ct. 2017.

By a 5–4 vote, the Supreme Court held that Kansas' SATP did not unconstitutionally compel the inmate to incriminate himself. No opinion garnered the votes of five justices, however; instead, the Court's disposition was based on a plurality opinion authored by Justice Kennedy, in which three other justices concurred, and a concurring opinion authored by Justice O'Connor. The plurality opinion began by recognizing that "[s]ex offenders are a serious threat in this Nation," *id.* at 32, 122 S.Ct. 2017, and that, "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id.* at 33, 122 S.Ct. 2017. The plurality opinion continued:

> Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. An important component of those rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct.... Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity.

*Id.* (citations omitted). The plurality specifically recognized that Kansas "does not offer legal immunity from prosecution based on statements made in the course of

the SATP." *Id.* at 34, 122 S.Ct. 2017. Despite the lack of immunity, the plurality noted that "[t]here is no contention ... that the program is a mere subterfuge for the conduct of a criminal investigation." *Id.* at 34, 122 S.Ct. 2017.

To resolve the question whether Lile was subject to unconstitutional compulsion to incriminate himself, the plurality opinion drew on the legal standard announced in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995):

> [T]he Court in *Sandin* held that challenged prison conditions cannot give rise to a due process violation unless those conditions constitute "atypical and significant hardship[s] on [inmates] in relation to the ordinary incidents of prison life." *See* 515 U.S. at 484[ 115 S.Ct. 2293]. The determination under *Sandin* whether a prisoner's liberty interest has been curtailed may not provide a precise parallel for determining whether there is compelled self-incrimination, but it does provide useful instruction for answering the latter inquiry. *Sandin* and its counterparts underscore the axiom that a convicted felon's life in prison differs from that of an ordinary citizen.... A prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.

536 U.S. at 37–38, 122 S.Ct. 2017.

In applying the "atypical and significant hardships" standard, the plurality rejected Lile's reliance on a series of cases in which the Supreme Court had held that threatened loss of employment and similar civil

consequences could result in unconstitutional compulsion of incriminatory statements. The plurality explained that, by "relying on the so-called penalty cases, respondent treats the fact of his incarceration as if it were irrelevant." *Id.* at 40, 122 S.Ct. 2017.

> Those cases ... involved free citizens given the choice between invoking the Fifth Amendment privilege and sustaining their economic livelihood. Those principles are not easily extended to the prison context, where inmates surrender upon incarceration their rights to pursue a livelihood and to contract freely with the State, as well as many other basic freedoms.

*Id.* (citation omitted). "[T]he fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis. A broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *Id.* at 36, 122 S.Ct. 2017 (citation omitted).

Instead of relying on the penalty cases, the plurality emphasized that the consequences Lile faced were far less significant than those faced by criminal defendants and convicted prison inmates in a series of cases which rejected Fifth Amendment claims:

> The cost to respondent of exercising his Fifth Amendment privilege—denial of certain perquisites that make his life in prison more tolerable—is much less than that borne by the defendant in *McGautha* [*v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)]. There, the Court upheld a procedure that allowed statements, which were made by a criminal defendant to mitigate his responsibility and avoid the death penalty, to be used against him as

evidence of his guilt. The Court likewise has held that plea bargaining does not violate the Fifth Amendment, even though criminal defendants may feel considerable pressure to admit guilt in order to obtain more lenient treatment.

Nor does reducing an inmate's prison wage and taking away personal television and gym access pose the same hard choice faced by the defendants in *Baxter v. Palmigiano,* 425 U.S. 308[ 96 S.Ct. 1551, 47 L.Ed.2d 810] (1976), *Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272[ 118 S.Ct. 1244, 140 L.Ed.2d 387] (1998), and *Minnesota v. Murphy,* 465 U.S. 420[ 104 S.Ct. 1136, 79 L.Ed.2d 409] (1984). In *Baxter,* a state prisoner objected to the fact that his silence at a prison disciplinary hearing would be held against him.... Whereas the inmate in the present case faces the loss of certain privileges, the prisoner in *Baxter* faced 30 days in punitive segregation as well as the subsequent downgrade of his prison classification status.

In *Murphy,* the defendant feared the possibility of additional jail time as a result of his decision to remain silent. The defendant's probation officer knew the defendant had committed a rape and murder unrelated to his probation. One of the terms of the defendant's probation required him to be truthful with the probation officer in all matters. Seizing upon this, the officer interviewed the defendant about the rape and murder, and the defendant admitted his guilt. The Court found no Fifth Amendment violation, despite the defendant's fear of being returned to prison for 16 months if he remained silent.

In *Woodard,* the plaintiff faced not loss of a personal television and gym access, but loss of life. In a unanimous opinion just four Terms ago, this Court held that a death row inmate could be

made to choose between incriminating himself at his clemency interview and having adverse inferences drawn from his silence. As here, the inmate in *Woodard* claimed to face a Hobson's choice: He would damage his case for clemency no matter whether he spoke and incriminated himself, or remained silent and the clemency board construed that silence against him. Unlike here, the Court nevertheless concluded that the pressure the inmate felt to speak to improve his chances of clemency did not constitute unconstitutional compulsion.

*Woodard*, *Murphy*, and *Baxter* illustrate that the consequences respondent faced here did not amount to unconstitutional compulsion.

536 U.S. at 42–43, 122 S.Ct. 2017 (other citations omitted).

Justice O'Connor's concurrence emphasized that, in the cases relied upon by the plurality, the adverse consequences resulted from an invocation of the right to remain silent only after the intervention of "a fair criminal process," *id.* at 53, 122 S.Ct. 2017, while in *McKune* the adverse consequences followed automatically from the invocation of the inmate's Fifth Amendment rights. The plurality rejected this distinction, however. Although it acknowledged that "[i]t is proper to consider the nexus between remaining silent and the consequences that follow," *id.* at 44, 122 S.Ct. 2017, it emphasized that the greater severity of the sanctions at issue in the cases it had described necessitated the rejection of Lile's Fifth Amendment claim:

While the automatic nature of the consequence may be a necessary condition to finding unconstitutional compulsion, however, that is not a sufficient reason alone to ignore *Woodard*, *Murphy*, and *Baxter*. Even if a consequence follows directly from a person's silence, one cannot answer the question whether the person has been compelled to incriminate himself without first considering the severity of the consequences.

... The parties in *Woodard*, *Murphy*, and *Baxter* all were faced with ramifications far worse than respondent faces here, and in each of those cases the Court determined that their hard choice between silence and the consequences was not compelled. It is beyond doubt, of course, that respondent would prefer not to choose between losing prison privileges and accepting responsibility for his past crimes. It is a choice, nonetheless, that does not amount to compulsion, and therefore one Kansas may require respondent to make.

*Id.* at 44–45, 122 S.Ct. 2017. The plurality also rejected the inmate's argument focused on a purported distinction between the state's conferral of a benefit versus its imposition of a penalty. "The answer to the question whether the government is extending a benefit or taking away a privilege rests entirely in the eye of the beholder." *Id.* at 46, 122 S.Ct. 2017.

The plurality concluded by observing:

Acceptance of responsibility is the beginning of rehabilitation. And a recognition that there are rewards for those who attempt to reform is a vital and necessary step toward completion. The Court of Appeals' ruling would defeat these objectives.... The Fifth Amendment does not require the State to suffer these programmatic disruptions when it seeks to rehabilitate those who are incarcerated for valid, final convictions.

The Kansas SATP represents a sensible approach to reducing the serious danger that repeat sex offenders pose to many innocent persons, most often children. The State's interest in rehabilitation is undeniable. There is, furthermore, no indication that the SATP is

merely an elaborate ruse to skirt the protections of the privilege against compelled self-incrimination. Rather, the program allows prison administrators to provide to those who need treatment the incentive to seek it.

*Id.* at 47–48, 122 S.Ct. 2017.

Justice O'Connor provided the necessary fifth vote supporting reversal of the Tenth Circuit's decision in *McKune.* She did not join in the plurality opinion, however, but instead wrote a concurring opinion which specifically took issue with much of the plurality's legal analysis. Thus, contrary to the plurality, Justice O'Connor argued that "the Fifth Amendment compulsion standard is broader than the 'atypical and significant hardship' standard we have adopted for evaluating due process claims in prisons." *Id.* at 48, 122 S.Ct. 2017. Contrary to the plurality, Justice O'Connor argued that Lile's claims must be analyzed under the "penalty cases," which found unconstitutional compulsion where employment-related and other consequences were imposed outside the prison context. *Id.* at 49–50, 122 S.Ct. 2017. Further, Justice O'Connor explicitly rejected the plurality's suggestion that the consequences facing criminal defendants or inmates in cases like *McGautha* and *Woodard* provided appropriate guidance: "I do not agree with the suggestion in the plurality opinion that these penalties could permissibly rise to the level of those in cases like [*McGautha* and *Woodard*]. The penalties potentially faced in these cases—longer incarceration and execution—are far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases." *Id.* at 52, 122 S.Ct. 2017 (citations omitted).

Although she disagreed with much of the plurality's analysis, and although she did not develop an alternative analytical framework, Justice O'Connor concurred in the result because she did "not believe the penalties assessed against respondent in response to his failure to incriminate himself are compulsive on any reasonable test." *Id.* at 54, 122 S.Ct. 2017; *see also id.* at 50, 122 S.Ct. 2017 ("I do not believe the consequences facing respondent in this case are serious enough to compel him to be a witness against himself.").

■ "*Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), instructs us that, where 'a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Id.* at 193, 97 S.Ct. 990." *State v. Hughes,* 272 S.W.3d 246, 252 (Mo.App. W.D.2008) (other citations omitted). Although numerous federal appellate courts have held that Justice O'Connor's concurring opinion in *McKune* states the narrowest ground of decision,[6] we disagree, and conclude that the plurality's analysis is controlling. Justice O'Connor's concurrence argued: that the standard for unconstitutional compulsion was "broader than the 'atypical and significant hardship' standard" adopted by the plurality; that the non-prison-context penalty cases provided a useful guidepost; and that the plurality inappropriately relied on cases finding no unconstitutional compulsion where criminal defendants and/or inmates were subjected to the threat of significant adverse consequences for refusing to in-

---

**6.** *See, e.g., Renchenski v. Williams,* 622 F.3d 315, 334 (3d Cir.2010); *United States v. Antelope,* 395 F.3d 1128, 1133 n. 1 (9th Cir.2005); *Gwinn v. Awmiller,* 354 F.3d 1211, 1225–26 (10th Cir.2004); *Ainsworth v. Stanley,* 317 F.3d 1, 4 (1st Cir.2002); *Searcy v. Simmons,* 299 F.3d 1220, 1225 (10th Cir.2002).

criminate themselves. Justice O'Connor plainly interpreted an inmate's Fifth Amendment rights more broadly than the plurality, and her approach would find more state actions unconstitutional under the Fifth Amendment than would the plurality's analysis. Given that Justice O'Connor proposed a more expansive reading of the Fifth Amendment (albeit without articulating a comprehensive theory), we fail to see how her opinion could be deemed "the narrowest grounds" among the justices concurring in the result. That designation more accurately applies to the plurality opinion. *See Johnson v. Fabian*, 735 N.W.2d 295, 304 (Minn.2007) ("Justice O'Connor agreed with the plurality's rationale that a consequence that satisfies the *Sandin* 'atypical and significant hardship' test would constitute compulsion for Fifth Amendment purposes. Her disagreement with the plurality was that she believed the test for compulsion should be *broader*, meaning that some consequences that do not satisfy the *Sandin* test may nevertheless constitute compulsion.").[7]

■ Under the plurality's analysis in *McKune*, the requirement that Spencer admit his responsibility for the sexual offenses of which he was convicted as a condition for successful completion of the MoSOP does not violate his Fifth Amendment rights. Like the sex-offender treatment program at issue in *McKune*, the MoSOP plainly bears "a rational relation to a legitimate penological objective." As the *McKune* plurality observed, "[s]ince 'most offenders will eventually return to society, [a] paramount objective of the corrections system is the rehabilitation of

those committed to its custody.' " 536 U.S. at 38, 122 S.Ct. 2017 (quoting *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). The plurality also recognized, with support in scientific research, that the requirement that sex offenders admit responsibility for their criminal offenses is an essential component of programs seeking to rehabilitate such offenders, and reduce their risk of recidivism upon release. *Id.* at 33, 122 S.Ct. 2017. These observations apply with equal force to the MoSOP. *See Depauw v. Luebbers*, 285 S.W.3d 805, 807 (Mo.App. E.D. 2009). Moreover, because admission of guilt is fundamental to achieving the legitimate rehabilitative goals of such sex-offender treatment programs, and reducing the risks these inmates pose to society, denying inmates who fail to complete such programs discretionary early release from incarceration is plainly "related to the program objectives." *McKune*, 536 U.S. at 38, 122 S.Ct. 2017.

We also conclude that the consequences imposed on Spencer for his failure to admit responsibility for his offenses—extension of his conditional release date to his maximum prison term, and denial of good-time credits—do not constitute " 'atypical or significant hardships ... in relation to the ordinary incidents of prison life.' " *McKune*, 536 U.S. at 37, 122 S.Ct. 2017 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). Both the availability of conditional release, and the application of good-time credits to reduce an inmate's period of incarceration, are subject to the discretion of the Board of Probation and Parole, and

7. As discussed *infra* in the text accompanying note 9, federal and state courts have held in a series of cases that the denial of discretionary good-time credits or early release, based on an inmate's failure to admit guilt as part of sex-offender treatment, does not violate the Fifth Amendment. Each of the cited federal

cases concluded that Justice O'Connor's separate concurrence in *McKune*, not the plurality opinion, supplied the governing standard. Any disagreement concerning which *McKune* opinion should be deemed controlling may accordingly be of only academic interest.

an inmate accordingly has no protected liberty interest in either benefit. Thus, our Supreme Court only recently emphasized the broad discretion of the Board of Probation and Parole with respect to an inmate's eligibility for conditional release:

> The board of probation and parole has plenary discretion in granting conditional release. Subsection 5 of both iterations of the statute clearly state that "[t]he date of conditional release from the prison term may be extended up to a maximum of the entire sentence of imprisonment by the board of probation and parole." Section 558.011, RSMo Supp.1990 and RSMo 1978. There are no limitations, conditions or carve outs.
>
> The conditional release statute vests a right in the board of probation and parole to use the conditional release program as a way to manage the department of corrections' prison populations....
>
> ... The board always has retained plenary discretion as to whether to issue a conditional release date. The board's *consideration* of granting conditional release to any of the inmates was a mere possibility, nothing more.

*Rentschler v. Nixon*, 311 S.W.3d 783, 788 (Mo. banc 2010); *see also Cooper v. Holden*, 189 S.W.3d 614, 618 (Mo.App. W.D. 2006) ("While the statute ... sets boundaries as to the maximum period of the sentence that could be the conditional release term, the statute also allows the Parole Board discretion in determining the conditional release term up to the maximum."); *Miller v. Mitchell*, 25 S.W.3d 658,

664 (Mo.App. W.D.2000) (as a result of the Board's discretion in this area, "an inmate does not have a protected liberty interest in conditional release"); *Elliott v. Carnahan*, 916 S.W.2d 239, 241–42 (Mo.App. W.D.1995) ("the larger statutory scheme" of § 558.011 "allows the board discretion as to the date of release based upon the conduct of the prisoner"); *see also Depauw*, 285 S.W.3d at 807 (holding that Board of Probation and Parole could lawfully extend inmate's conditional release date to maximum release date based on inmate's failure to complete MoSOP, even though inmate was then serving sentence on non-sexual offense).[8]

The DOC and the Board of Probation and Parole have similarly broad discretion in the award of good-time credits. The system for the award of good-time credits to Missouri prison inmates is established by § 558.041, which provides in relevant part:

> 1. Any offender committed to the department of corrections ... *may* receive additional credit in terms of days spent in confinement upon recommendation for such credit by the offender's institutional superintendent when the offender meets the requirements for such credit as provided in subsections 3 and 4 of this section....
>
> ....
>
> 3. The director of the department of corrections shall issue a policy for awarding credit. The policy *may* reward an inmate who has served his sentence in an orderly and peaceable

---

8. Putting aside Spencer's constitutional arguments, we note that the Board of Probation and Parole was statutorily authorized to extend Spencer's conditional release date based on his failure to complete the MoSOP. "Pursuant to Section 558.011[.5], the Parole Board may extend an inmate's conditional release date for failing to follow the rules and

regulations of the Division." *Depauw*, 285 S.W.3d at 807. Sexual offenders are required to complete MoSOP by statute and DOC policy. *See* § 589.040.2. Spencer's failure to complete the program thus justified the extension of his conditional release date. *Depauw*, 285 S.W.3d at 807.

manner and has taken advantage of the rehabilitation programs available to him. Any violation of institutional rules or the laws of this state may result in the loss of all or a portion of any credit earned by the inmate pursuant to this section.

(Emphasis added.)

Pursuant to § 558.041.3, the Department has enacted regulations governing the award of good-time credits. Those regulations provide that inmates "may be eligible to receive time credit." 14 CSR 10–5.010(2)(A). Where an inmate is eligible for time credit, that time credit is subtracted from the inmate's conditional release date, resulting in a "projected time credit release date." *Id.* The DOC's policy further provides that "[i]nmates demonstrating acceptable behavior and appropriate program involvement *shall be eligible for consideration for administrative parole release* on [their projected time credit release] date," *id.* (emphasis added); thus, even where an inmate is eligible for good-time credits, such credits merely entitle the inmate to consideration for administrative parole.

Section 558.041 does not create an entitlement to good-time credit, but leaves substantial discretion as to the award of such credit in the Board of Probation and Parole:

> This court has previously interpreted the language of section 558.041.3 and found that the language vests the Department with discretionary authority. *See Badgley v. Mo. Dep't of Corr.*, 977 S.W.2d 272, 276 (Mo.App. W.D.1998). While section 558.041.3 requires the Department to issue a policy for awarding credit, the language of the statute does not indicate that the policy *must* award inmates with time credit; rather, it states that the policy *may* reward an inmate with time credit. *See Badgley,*

977 S.W.2d at 276. Charron further claims that, based on the language of section 558.041.1, inmates have the right to expect time credit. This subsection provides that inmates may receive additional credit when they meet the requirements for such credit as provided in subsections 3 and 4 of the statute. As noted in *Badgley,* this language is discretionary and nothing in section 558.041 creates an entitlement to time credit.

*Charron v. Nixon,* 318 S.W.3d 740, 744 (Mo.App. W.D.2010).

In *Winslow v. Nixon,* 93 S.W.3d 795 (Mo.App. E.D.2002), an inmate was unable to complete the MoSOP due to limited resources available for the program; based on his failure to complete the MoSOP in a timely fashion, "[t]he Board of Probation and Parole denied Winslow ... good time credit and an early release date." *Id.* at 796. Applying *Sandin's* "atypical and significant hardship" test— the same test the *McKune* plurality applied to Fifth Amendment claims like Spencer's—the Eastern District concluded that the inmate had no liberty interest in participation in the MoSOP:

> [U]nder *Sandin,* any hardship suffered by Winslow as a result of his inability to participate in the MOSOP is not either atypical or significant "in relation to the ordinary incidents of prison life" so as to implicate a liberty interest protected by due process. First, there is no indication that Winslow is the only sex offender imprisoned at FCC who is unable to participate in or complete the MOSOP. Rather, the record reveals that the resource limitation affecting the MOSOP is adversely affecting the ability of a number of sex offenders at FCC to participate in and complete the MOSOP. Second, such a hardship is not significant because, as we have observed, the

"MOSOP is not penal in nature.... Rather, it is a rehabilitative program which [the sex offender] is required to complete before he is eligible for parole.... Failure to complete the program does not add additional punishment, such as an additional sentence, beyond that which has already been imposed upon the sex offender.... The only effect of [the sex offender] not completing [the] MOSOP has been to extend his possible early release date."

*Id.* at 800 (quoting *State ex rel. Nixon v. Pennoyer*, 39 S.W.3d 521, 523 (Mo.App. E.D.2001)) (other citations omitted).

Multiple cases from other jurisdictions have held that sex offender treatment programs do not violate the Fifth Amendment privilege against self-incrimination, even though failure to complete the programs results in forfeiture of good-time credits or the opportunity for early release, where—as in Missouri—the award of such benefits is left to the discretion of corrections officials. *See, e.g., Entzi v. Redmann*, 485 F.3d 998, 1004 (8th Cir.2007) ("The North Dakota Department of Corrections has the exclusive discretion to determine whether an offender should be credited with a performance-based sentence reduction. The loss of an opportunity for such a discretionary sentence-reduction credit is not among the consequences for noncompliance that go 'beyond the criminal process and appear, starkly, as government attempts to compel testimony.'" (citations omitted)); *Searcy v. Simmons*, 299 F.3d 1220, 1226 (10th Cir.2002) (where Kansas regulations merely provide that "an 'inmate *may* earn good time credits,'" holding that "foreclosing Mr. Searcy from the

mere *opportunity* to earn good time credits is not a new penalty, but only the withholding of a benefit that the KDOC is under no obligation to give"); *Wirsching v. Colorado*, 360 F.3d 1191, 1203 (10th Cir. 2004) (following *Searcy* where "the Department of Corrections in Colorado retains discretion in awarding good-time credits"); *Gwinn v. Awmiller*, 354 F.3d 1211, 1226 (10th Cir.2004) (same as *Wirsching*); *Ainsworth v. Stanley*, 317 F.3d 1, 5 (1st Cir.2002) (no unconstitutional compulsion where "nonparticipation in [New Hampshire's sex-offender treatment program] almost always results in an inmate being denied parole"; re-adopting rationale of earlier decision, 244 F.3d 209 (1st Cir.2001)); *State v. Pritchett*, 69 P.3d 1278, 1287 ¶ 36 (Utah 2003) (no unconstitutional compulsion where child sex offenders' right to probationary release to residential treatment facility conditioned on successful completion of sex offender treatment program, since "a 'defendant has no right to be placed on probation, that being within the discretion of the trial judge.'" (citation omitted)).[9]

We acknowledge that, in *McKune*, the plurality specifically noted that "respondent's decision not to participate in the Kansas SATP did not extend his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole." 536 U.S. at 38, 122 S.Ct. 2017. These observations cannot fairly be read to hold that extending a term of incarceration, or altering an inmate's eligibility for good-time credits or parole, necessarily constitute unconstitutional compulsion, given the plurality's discussion of cases in which significant adverse consequences, in-

9. By contrast, the Minnesota Supreme Court found unconstitutional compulsion where, under Minnesota law, extension of an inmate's supervised release date is *not* discretionary, but the presumption of release on the super-

vised release date instead " 'is overcome only if the inmate commits a disciplinary offense.' " *Johnson v. Fabian*, 735 N.W.2d at 302 (citation omitted).

cluding increased periods of incarceration, flowed from a refusal to provide incriminatory statements.

The consequences for failure to complete the MoSOP do not constitute an "atypical or significant hardship," and the program—including the requirement that participants admit their guilt for the sexual offenses for which they were convicted—furthers the legitimate penological objective of rehabilitating sex offenders and reducing their risk of recidivism. The circuit court did not err in finding that Spencer failed to state a claim under the Fifth Amendment.

## II.

■ Spencer additionally argues that the DOC retroactively extended his conditional release date in violation of the *ex post facto* clause of the United States Constitution. His *ex post facto* claim fails, however, for two independent reasons. *First,* the consequences imposed upon Spencer for his failure to complete the MoSOP do not constitute additional punishment. *Second,* he does not challenge a "law" subject to *ex post facto* limitations, but instead challenges a policy adopted by the Department and the Board of Probation and Parole to enforce the legislative directive that sexual offenders complete a sexual offender treatment program.

The Missouri Supreme Court recently rejected a similar *ex post facto* claim in *Rentschler v. Nixon,* 311 S.W.3d 783 (Mo. banc 2010), on the basis that extension of an inmate's conditional release term (or in that case, a statutory amendment which completely eliminated the plaintiff-inmate's right to conditional release) did not affect the inmate's total punishment for the offense, and therefore could not form the basis of an *ex post facto* claim:

The federal and Missouri constitutions prohibit ex post facto laws. U.S. Const.

art. I, sec. 10, cl. 1; Mo. Const. art I, sec. 13. However, ex post facto laws only affect criminal matters—in this case, the sentence that appellants received. Section 558.011 specifically bifurcates a conviction into "a sentence term" (which would be germane to an ex post facto consideration) and "a conditional release term" (which is not germane).

Any modification of the *conditional* term cannot affect the sentence term originally imposed against Laney and Rentschler. Rentschler's *sentence* term before and after the 1990 amendment was life in prison. Laney's *sentence* term before and after the 1990 amendment was 30 years in prison. Nothing in the amendment to section 558.011 changes those sentence terms, so there can be no violation of the ex post facto clause.

*Id.* at 788 (other citations omitted).

We have specifically applied this same reasoning to the extension of a conditional release term based upon an inmate's failure to complete MoSOP:

MOSOP is not penal in nature. Rather, it is a rehabilitative program which appellant is required to complete before he is eligible for parole. Failure to complete the program does not add additional punishment, such as an additional sentence, beyond that which has already been imposed upon the sex offender. In fact, application of the requirements of § 589.040.2 to appellant did not result in appellant receiving additional punishment for the crime he committed in 1983. Appellant is still sentenced to fifteen years imprisonment. The only effect of appellant not completing MOSOP has been to extend his possible early release date. Because the 1990 amendment to § 589.040.2 does not impose any additional punishment on ap-

pellant, it does not violate the prohibition against ex post facto laws.

*Kelly v. Gammon,* 903 S.W.2d 248, 250–51 (Mo.App. W.D.1995) (citations omitted).

■ Nor is the Department's *enforcement* of the policy stated by the General Assembly in § 589.040.2 an *"ex post facto law."* Because "[t]he prohibition against *ex post facto* laws is 'directed to the legislature rather than to other branches of government,'" mere changes in an agency's enforcement policies do not violate the *ex post facto* clause. *Miller v. Mitchell,* 25 S.W.3d 658, 663 (Mo.App. W.D.2000) (citation omitted). Where Spencer does not challenge § 589.040.2 itself, but only the consequences meted out by the Department and the Board of Probation and Parole for his failure to complete the program in their implementation of § 589.040.2's mandate, his *ex post facto* claim fails:

> By changing its policy, the Department was not enacting a new law. Rather, it was changing its enforcement of an existing law, § 589.040, to conform with that law's requirement that all sexual offenders successfully complete MOSOP. The potential extension of an inmate's conditional release date upon the failure to complete MOSOP is merely an enforcement mechanism for ensuring

compliance with the statute. Therefore, the Department of Corrections' revised policy does not implicate the *ex post facto* clauses of the Missouri and United States Constitutions.

*Miller,* 25 S.W.3d at 664.[10]

### III.

Finally, Spencer alleges that the circuit court erred in denying him an opportunity to amend his petition before dismissing his claims with prejudice.

■ "Leave to amend is within the discretion of the trial court, and this court will not overturn the decision made by the trial court absent an abuse of that discretion. A party does not have an absolute right to file an amended petition." *Bratt v. Cohn,* 969 S.W.2d 277, 284 (Mo.App. W.D.1998) (citation omitted). "Although leave to amend should be freely granted, a court rightly refuses such a request if the requested amendment would not cure the deficiency." *Atkins v. Jester,* 309 S.W.3d 418, 425–26 (Mo.App. S.D.2010) (quoting *Asmus v. Capital Region Family Practice,* 115 S.W.3d 427, 433 (Mo.App. W.D.2003)). Spencer's briefing fails to identify any additional facts he would have alleged by way of his amended petition, which would have cured the legal defects in his originally-asserted claims.[11] In these circumstances,

10. To the extent Spencer claims that the Department failed to enroll him in the MoSOP in a timely fashion that would have permitted him to complete the program prior to his time-credit or conditional release dates, we fail to see how he could have been harmed by such scheduling issues: Spencer has repeatedly and explicitly stated throughout this litigation that he will not perform the actions necessary to successfully complete the program, no matter how much time he is given to do so.

11. Spencer's amended petition alleged that, on December 8, 2009—eight months *after* the filing of his original petition—the Board of Probation and Parole formally extended his

conditional release date to his maximum sentence. "The function of the amendment rules is to enable a party to present matters that were overlooked or unknown at the time that the original pleading was filed but without change in the original cause of action." *Baker v. City of Kansas City,* 671 S.W.2d 325, 329 (Mo.App. W.D.1984). To the extent Spencer sought to assert new and different claims concerning the Board's December 8, 2009 action, those claims would properly be asserted by way of a *supplemental* pleading under Rule 55.33(d), not an *amended* pleading. Spencer has not argued that he was entitled to file a supplemental petition after judgment, or that

where an amendment would be futile, the circuit court did not abuse its discretion in denying Spencer leave to amend.[12]

## Conclusion

The circuit court's judgment is affirmed.

All concur.

the trial court abused its discretion by denying leave to file a supplemental petition.

12. At various points in his briefing Spencer complains that he was not permitted to attend a hearing the trial court held on the defendants' motions to dismiss. Under § 491.230.2, however, "[n]o person detained in a correctional facility ... shall appear and attend or be caused to appear and attend any civil proceeding, regardless of whether he is a party, except when: ... (2) [t]he offender is a party to the civil proceeding and the court finds that the offender will be substantially and irreparably prejudiced by his failure to attend a trial on the merits in the civil proceeding." Spencer has not shown that he was "substantially and irreparably prejudiced" by his non-attendance at the motion hearing. He was permitted to file pleadings asserting his legal position, the trial court's ruling does not rely on any evidence or arguments developed exclusively at the motion hearing, and Spencer has received *de novo* review of the trial court's adverse ruling in this Court.